**UNITED STATES DISTRICT COURT**
**DISTRICT OF MINNESOTA**

UNITED STATES OF AMERICA,

Plaintiff,

v.

DEMARCUS LEE WASHINGTON,

Defendant.

Case No. 21-cr-126 (ADM/ECW-1)

**ORDER**
**AND**
**REPORT AND RECOMMENDATION**

This matter is before the Court on Defendant Demarcus Lee Washington's:

(1) *Giglio* Motion (Dkt. 59); (2) Amended Motion for Disclosure of Confidential

Informant (Dkt. 64); and (3) Amended Motion to Suppress Evidence from All Search

Warrants, which also seeks a *Franks* hearing[1] ("Amended Motion to Suppress and for

*Franks* Hearing") (Dkt. 65).  This case has been referred to the undersigned United States

Magistrate Judge for a report and recommendation pursuant to 28 U.S.C. § 636 and Local

Rule 72.1.

---

[1]    Defendant Demarcus Lee Washington filed a Pro Se Motion to Suppress the Fruits
of an Illegal Search and Seizure in which he sought suppression on *Franks* grounds on
September 7, 2021 (Dkt. 39), which was denied on September 21, 2021 (Dkt. 45).
Defendant, through counsel, filed a Motion to Suppress Evidence from All Search
Warrants, which also sought a *Franks* hearing, on October 12, 2021 (Dkt. 61), and then
filed the Amended Motion to Suppress and for *Franks* Hearing on October 18, 2021 (Dkt.
65).  The Court only addresses the Amended Motion to Suppress and for *Franks* Hearing
(Dkt. 65) in this Order and Report and Recommendation.

The Court held a hearing on the Motions on November 29, 2021.[2]  (Dkt. 75.)
Andrew Dunne, Assistant United States Attorney, appeared on behalf of the United States
of America ("the Government") and Paul Sarratori on behalf of Defendant Demarcus Lee
Washington ("Defendant" or "Washington") who was present at the hearing.  The Court
addresses the Motions below.

## I.    *GIGLIO* MOTION

Defendant moves the Court for an Order requiring the Government to disclose
certain categories of exculpatory and impeaching information pursuant to *Brady v.
Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their
progeny.  (Dkt. 59.)  The Government responds that it is aware of its obligations under
*Brady*, *Giglio*, and their progeny; that it has complied, and will continue to comply, fully
with those obligations; and that to the extent evidence exists which is both favorable to
the Defendant and material to either guilt or punishment, the evidence will be, or already
has been, timely disclosed to Defendant; but the Government objects to the use of *Brady*
as a "discovery device."  (Dkt. 74.)  Neither party made any additional argument
regarding the *Giglio* Motion during the hearing.  (*See* Dkt. 83.)  Accordingly, the Court
grants the *Giglio* Motion insofar as the Government is ordered to comply with its
requirement to disclose materials covered by *Brady v. Maryland*, 373 U.S. 83 (1963),
*Giglio v. United States*, 405 U.S. 150 (1972), and their progeny, and further insofar as

---

[2]    The November 29 hearing was held by then United States Magistrate Judge
Katherine M. Menendez prior to her elevation to District Judge.  The case was reassigned
to the undersigned Magistrate Judge on December 22, 2021.  (Dkt. 82.)

within ten (10) days of the date of this Order, the Government must disclose all

*Brady*/*Giglio* information in its possession or of which it has become aware as of the date

of this Order, if not previously disclosed, and must promptly supplement its disclosure

upon receipt of any additional *Brady*/*Giglio* information not previously disclosed.  To the

extent the *Giglio* Motion is based on the Amended Motion to Suppress and for *Franks*

Hearing and Amended Motion for Disclosure of Confidential Informant, it is denied for

the reasons stated in Sections II and III.

## II.    AMENDED MOTION TO SUPPRESS AND FOR *FRANKS* HEARING (DKT. 65)

In his Amended Motion to Suppress and for *Franks* Hearing, Washington seeks

suppression of any and all evidence obtained as a result of 12 search warrants (admitted

into evidence as Government Exhibits 1 to 12) ("the Warrants") on the grounds that the

information contained in the supporting affidavits is stale, and also asks the Court to hold

a hearing pursuant to *Franks v. Delaware*, 438 U.S. 154, 171 (1978).  (Dkt. 65.)  The 12

warrants are:

- Government Exhibit 1 - Search Warrant, dated April 26, 2021, signed by Judge Joy Bartscher of Ramsey County District Court for electronic information from Washington's cell phone;

- Government Exhibit 2 - Search Warrant, dated May 4, 2021, signed by Judge Richard H. Kyle, Jr., of Ramsey County District Court for Washington's person, the person of Washington's fiancée/girlfriend Shekiala Mychall McMillan ("McMillan"), and Washington's business and vehicle;

- Government Exhibit 3 - Search Warrant, dated May 6, 2021, signed by Judge Robyn Millenacker of Ramsey County District Court for a DNA buccal swab from Washington;

- Government Exhibit 4 - Search Warrant, dated May 12, 2021, signed by Judge Kellie Charles of Ramsey County District Court for seven electronic devices seized from Washington at the time of his arrest;

- Government Exhibit 5 - Search Warrant, dated May 24, 2021, signed by Judge Nicole Starr of Ramsey County District Court for a cell phone seized from Washington at the time of his arrest;

- Government Exhibit 6 - Search Warrant, dated April 28, 2021, signed by Judge David Brown of Ramsey County District Court for the installation of a GPS tracker on Washington's vehicle;

- Government Exhibit 7 - Search Warrant, dated May 4, 2021, signed by Judge Barry Sullivan of Anoka County District Court for Washington's person, Washington's fiancée/girlfriend, and Washington's residence and vehicle];

- Government Exhibit 8 - Search Warrant, dated May 6, 2021, signed by Judge Barry Sullivan of Anoka County District Court for a DNA buccal swab from Washington's fiancée/girlfriend;

- Government Exhibit 9 - Search Warrant, dated May 6, 2021, signed by Judge Leonard Castro of Ramsey County District Court for certain of Washington's and McMillan's bank accounts;

- Government Exhibit 10 - Search Warrant, dated May 6, 2021, signed by Judge Leonard Castro of Ramsey County District Court for certain of Washington's and McMillan's bank accounts;

- Government Exhibit 11 - Search Warrant, dated May 6, 2021, signed by Judge Leonard Castro of Ramsey County District Court for certain of Washington's and McMillan's bank accounts; and

- Government Exhibit 12 - Search Warrant, dated May 6, 2021, signed by Judge Robyn Millenacker of Ramsey County District Court for a white Mercedes-Benz SUV in which Washington's fiancée/girlfriend was a passenger.

(Dkts. 63-1 to 63-12; *see also* Gov't Exs. 1-12, Dkts. 81-1 to 81-12; Dkt. 73 at 1-2.)[3]

---

[3]    Unless otherwise stated, all page citations are to the CM/ECF pagination.

Washington's arguments focus on Government Exhibits 1 and 2, and he did not make any argument specific to any other warrant.[4]  The Court therefore describes Government Exhibits 1 and 2 in detail below.  The Court next addresses Washington's *Franks* arguments, as they constitute the bulk of the Amended Motion to Suppress and for *Franks* hearing, and then turns to his staleness argument.

## A.    April 26, 2021 Warrant (Gov't Ex. 1)

On April 26, 2021, Narcotics Investigator Nathan Garland ("Investigator Garland") of the Mounds View Police Department, assigned to the Ramsey County Violent Crime Enforcement Team ("VCET"), applied for a warrant "for the installation and use of a pen register, trap/trace device, electronic tracking device, global positioning system (GPS) Technology, and 'E911' location technology, for/on telephone number(s): 612-212-92[XX] and the disclosure of subscriber, cell site, and call detail information." (Gov't Ex. 1, Dkt. 81-1 at 1.)

In the affidavit in support of his application for the search warrant, Investigator Garland stated that the Ramsey County Sheriff's Office VCET was "conducting a criminal investigation of [Defendant] and others for the following criminal offenses: [n]arcotic sales and/or narcotics possession.  Your affiant also certifies that the suspect in this investigation is utilizing telephone numbers 612-212-92[XX], believed to be used by [Defendant] . . . in furtherance of the subject offenses;" and that "information likely to be

---

[4]     At the November 29 hearing, Washington agreed that if Government Exhibits 1 and 2 were based on sufficient probable cause, the other Warrants, because they are based on the same set of facts, would also be based on sufficient probable cause.  (Dkt. 83 at 24.)

obtained from the [requested warrant] is relevant to the ongoing criminal investigation in that it is believed that this information will concern the aforementioned offenses." (*Id.* at 2-3 ¶ 2.) According to Investigator Garland, he spoke with a Confidential Informant ("CI") in the month of April 2021 who informed Investigator Garland that he/she had information on "a heroin dealer that went by the nickname of 'Ghost,' later determined to be previously identified and known to Law Enforcement as [Washington]." (*Id.* at 3 ¶ 5.) The CI informed Investigator Garland that he/she had purchased heroin from Washington "on many occasions, with the most recent being days prior" to the interview, that Washington was "a black male in his 30s [who] primarily drove a white GMC Yukon" with the first three digits of his license plate being "455," and that Washington worked at a shoe store inside Rosedale Mall[5] located in Roseville, Minnesota. (*Id.*) The CI further informed Investigator Garland that he/she contacted Washington through the phone number, 612-212-92[XX] when he/she needed to obtain quantities of heroin and that Washington would tell the CI where to meet, which was mainly at the Rosedale Mall. (*Id.* at 3-4 ¶ 6.) According to the CI, as stated in Investigator Garland's affidavit, Washington would then meet the CI at the prescribed place, arriving either on foot or in the white GMC Yukon, and the CI would then either enter the white GMC Yukon or Washington would enter the CI's vehicle to conduct the heroin transaction, which took seconds to complete. (*Id.*) The CI showed Investigator Garland electronic messages of the CI informing Washington that he/she was at "the drug deal location," using the phone

---

[5] "Rosedale Mall" and "Rosedale Center" is used interchangeably by the parties. The Court does the same.

number, 612-212-92[XX].  (*Id.*)

Investigator Garland stated in the affidavit that law enforcement officials were aware of Washington prior to the April 2021 contact with the CI; that Investigator Garland knew that Washington worked at a shoe store inside Rosedale Mall and drove a white GMC Yukon with the license plate beginning in "455" registered to him in the State of Minnesota; that Investigator Garland knew that Washington was being investigated by law enforcement for the sale and possession of heroin; and that the CI was shown a photo of Washington, "without any identifying names or physical characteristics, and the CI stated the male in the photo was indeed 'Ghost', aka Washington."  (*Id.* at 4 ¶ 7.)  Investigator Garland stated that he had corroborated/vetted the CI's information and "believe[d] it to be very accurate and reliable."  (*Id.*) Investigator Garland further stated that based on his training and experience, he knew "that drug dealer's [sic] will use cellular phones to facilitate the possession and sale of controlled substances such as heroin," "strongly believe[d] that Washington is utilizing his cellular phone . . . for the purpose of obtaining and selling controlled substances in the Twin Cities metro area," and believed that obtaining mobile phone GPS data from Washington's phone would "assist Law Enforcement with the narcotic investigation into Washington."  (*Id.* at 4-5 ¶¶ 7, 10.)  Accordingly, Investigator Garland requested issuance of the warrant to obtain the information requested for a period of sixty days.  (*Id.* at 5 ¶ 14-17, 6.)  Ramsey County District Judge Joy Bartscher issued the warrant on April 26,

2021 ("April 26 Warrant").  (*Id.* at 6-9.)

**B.      May 4, 2021 Warrant (Gov't Ex. 2)**

On May 4, 2021, Investigator Garland filed another application for a search

warrant seeking authorization to search Washington's person; the person of Shekiala

Mychall McMillan, who was believed to be Washington's girlfriend[6]; the premises of

[XXXX] Highway 36 West #499 Roseville, Minnesota 55113, County of Ramsey, State

of Minnesota, also known as Twin Cities Sneakers LLC, located inside of Rosedale

Center; and a white 2021 Ford Explorer, Minnesota License Plate: FXT-[XXX].  (Gov't

Ex. 2, Dkt. 81-2 at 2, 7-8.)

In the affidavit in support of his application for the search warrant, Investigator

Garland stated that in March 2021, the Ramsey County VCET opened a narcotic

investigation into a suspected drug dealer that went by the name "Ghost," who was later

identified as Washington.  (*Id.* at 3.)  Investigator Garland noted that after speaking to "at

least one Identified Individual" ("Identified Individual"), it was learned that Defendant

co-owned a shoe store with McMillan in Rosedale Center, which was later identified as

Twin Cities Sneakers LLC, located at [XXXX] Highway 36 West #499 Roseville,

Minnesota 55113.  (*Id.*)  Investigator Garland stated that the Identified Individual noted

that Washington possessed and sold controlled substances in and around Rosedale

Center.  (*Id.*)

---

[6]      The affidavit stated that McMillan was believed to be Washington's girlfriend and
they were expected to be together when the warrant was executed because they were
"almost always together" based on previous investigations.  (Dkt. 81-2 at 8.)

According to Investigator Garland, in April 2021, he spoke with a CI who stated that he/she had information on "a [h]eroin/[c]ontrolled-[s]ubstance dealer that went by the nickname of 'Ghost,'" whom the CI had purchased heroin/controlled substances from on "many occasions, with the most recent being days prior to our interview."  (*Id.*)  The CI stated that "Ghost" was an "African American male in his 30s, primarily drove a white GMC Yukon among others, and worked at Rosedale Center located in Roseville, MN," that "Ghost" worked at a shoe store inside the shopping center and "the first three digits on Ghost's license plate were '455,'" and that the CI contacted "Ghost" for narcotic transaction purposes at the phone number of 612-212-92[XX].  (*Id.*)  Investigator Garland stated in the affidavit that the "CI was shown a photo of Washington, without any identifying names or physical characteristics, and the CI stated the male in the photo was indeed 'Ghost,'" and that based on the "previously opened narcotic investigation into Washington, [Investigator Garland] knew that Washington worked at a shoe store inside the Rosedale Mall and that he owned a White GMC Yukon."  (*Id.*)  Investigator Garland stated that Washington was previously stopped by a law enforcement officer while driving the white GMC Yukon in the recent past, during which time Washington informed the officer that stopped him that he was the owner of Twin Cities Sneakers LLC in Rosedale Center.  (*Id.* at 3-4.)

In the affidavit, Investigator Garland described the following three controlled buys of narcotics from Washington by the CI.  (*Id.* at 4-7.)

### 1.    Controlled Buy #1

According to Investigator Garland, "[w]ithin 72 hours of April 26th, 2021," Investigator Garland and other investigators from the Ramsey County VCET Unit conducted a controlled buy involving the CI and Washington. (*Id.* at 4.)  Prior to the scheduled controlled buy, VCET investigators met with the CI, searched the CI's vehicle with no contraband found, and then provided the CI "with a sum of marked US Currency for the purpose of purchasing a quantity of a controlled substance." (*Id.*)  The CI then contacted Washington via the 612-212-92[XX] phone number with the intent of purchasing narcotics, and a "male voice on the other end of the line told the CI, '[y]eah, come to the mall.'" (*Id.*)  VCET investigators than followed the CI to Rosedale Center, where the investigators observed the CI meet with an individual that arrived in a "white 2021 Ford Explorer" with a license plate FXT-[XXX], saw the individual exit the vehicle and enter the CI's vehicle, and saw the individual exit the CI's vehicle. (*Id.*)  Then the investigators followed the CI as the CI drove away from "the [c]ontrolled-[b]uy location and debriefed him/her," at which time the CI handed Investigator Garland a "baggie which contained a powdery substance." (*Id.*)  Investigator Garland then "asked the CI who he purchased the substance from, and she / he said 'Ghost' (Washington). [Investigator Garland] showed the CI a photo of Washington, without any identifying names or physical characteristics, and the CI confirmed that it was the same individual that he / she just purchased the powdery substance from," and Investigator Garland thereafter "had the powdery substance analyzed which tested positive for Cocaine." (*Id.* at 4-5.)

10

Investigator Garland stated that he was later informed that after the controlled buy with the CI, VCET investigators observed "Washington quickly meeting with other suspected narcotic customers in the same location and vehicle," and that after the controlled buy with the CI, VCET investigators conducted surveillance of the 2021 white Ford Explorer as it left Rosedale Center, followed the white Ford Explorer, which took various routes until it "eventually stopped in the driveway of [XXXX] Xylite Street NE Blaine, MN 55449" ("Blaine Home"), which is the address listed in the Minnesota Department of Motor Vehicle for McMillan's driver's license and at which "Law Enforcement previously believed Washington to be living."  (*Id.* at 4-5.)  The VCET investigators then observed Washington, McMillan, and a young child exit the white Ford Explorer and enter the Blaine Home.  (*Id.* at 5.)  Electronic surveillance for the 612-212-92[XX] showed the phone belonging to that number was also at the Blaine Home around the same time that the white Ford Explorer arrived there.  (*Id.*)

Investigator Garland stated in the affidavit that based on his training and experience, he knew it was a "a common tactic used by narcotic dealers to not take direct routes of travel home after conducting a narcotic transaction . . . in the attempt to detect anyone that may be following them such as Law Enforcement."  (*Id.*)  Investigator Garland stated that the day after the controlled buy, he obtained a subpoena that was served on PV Holding Corp. (Avis Budget Rental Car) who owned the Ford Explorer and according to documents provided by Avis Budget Rental Car, the "vehicle was rented to [Washington] on April 26th, 2021 and it was due back on May 2nd, 2021."  (*Id.*)

### 2.    Controlled Buy #2

According to Investigator Garland, within 72 hours of April 29, 2021, he, along with other investigators from the Ramsey County VCET Unit, conducted a second controlled buy involving the CI and Washington.  (*Id.*)  Prior to the controlled buy, the investigators met with the CI, searched the CI's vehicle with no contraband found, provided the CI with a "sum of marked US Currency for the purpose of purchasing a quantity of a controlled substance," and then the CI contacted "Washington via phone number 612-212-92[XX] for the purpose of purchasing narcotics.  The male voice on the other end of the line told the CI to be at the 'mall' in 20 minutes."  (*Id.*)  VCET investigators then followed the CI directly to Rosedale Center, conducted physical surveillance inside and outside Rosedale Center, and about 20 minutes after the CI made the phone call, "VCET Surveillance inside Rosedale Center observed Washington exiting 'Twin Cities Sneakers LLC' carrying a white shoe box underneath his arm, VCET Investigators followed Washington on foot and observed him walk into the lower level Marcy's [sic] parking lot.  Around this time, Washington contacted the CI and told her/him to come to the lower level of the Macy's parking lot."  (*Id.* at 5-6.)

According to Investigator Garland, VCET investigators then observed the CI in the lower level of the Macy's garage, saw the CI exit his/her vehicle and enter another vehicle, "which VCET investigators observed Washington getting into.  Seconds later, the CI exited the vehicle and got back into his/her vehicle and left the area."  (*Id.* at 6.)  VCET investigators then followed the CI as he/she drove away from that location and "debriefed him/her.  The CI handed [Investigator Garland] a baggie which contained a

powdery substance" and Investigator Garland "asked the Cl who he purchased the substance from, and she / he said 'Ghost' (Washington)." (*Id.*) Investigator Garland then "showed the Cl a photo of Washington, without any identifying names or physical characteristics, and the Cl confirmed that it was the same individual that he / she just purchased the powdery substance from." (*Id.*) Investigator Garland thereafter had "the powdery substance analyzed which tested positive for 'make-up.'"[7] (*Id.*)

### 3.    Controlled Buy #3

Investigator Garland attested in the affidavit in support of the application for the search warrant that within 72 hours of making the application, he, along with other investigators from the Ramsey County VCET Unit, conducted a third controlled buy involving the CI and Washington. (*Id.*) According to Investigator Garland, he and another VCET investigator met with the CI prior to the controlled buy, searched the CI's vehicle with no contraband found, provided the CI with "a sum of marked US Currency for the purpose of purchasing a quantity of a controlled substance. The CI then contacted Washington via phone number 612-212-92[XX] and asked if he or she could purchase narcotics. The male voice on the other end of the line told the CI to meet him 'quick' at the gas station located near County Road J and Xylite Street NE Blaine, MN (Anoka County)," which was "only blocks away from [the Blaine Home]." (*Id.*) VCET investigators had been conducting surveillance at the Blaine Home where the white Ford Explorer was parked in the driveway, saw Washington, McMillan, and a young child

---

[7]    The affidavit does not provide any additional information about the "make-up."

enter the white Ford Explorer, observed the vehicle exit the driveway and "dr[i]ve directly to the Casey's Gas Station located at [XXXX] Xylite Street NE Blaine, MN. VCET Surveillance observed Washington exit his vehicle, walk up to the CI's vehicle window, make contact for mere seconds, and then part ways from one another." (*Id.*) Investigator Garland stated that:

> The CI then exited the parking lot and met with [Investigator Garland] and another VCET investigator at a predetermined location to be debriefed. The CI handed [Investigator Garland] a baggie which contained a powdery substance, which appeared to be the same product from the controlled-buy on or around April 26th, 2021. [Investigator Garland] asked the CI who he purchased the substance from, and she / he said "Ghost" (Washington). [Investigator Garland] showed the CI a photo of Washington, without any identifying names or physical characteristics, and the CI confirmed that it was the same individual that he / she just purchased the powdery substance from. [Investigator Garland] later had the powdery substance analyzed which tested positive for Cocaine and Fentanyl.

(*Id.* at 6-7.)

Investigator Garland stated that since April 26, 2021, electronic phone tracking showed Washington's phone primarily in the location of Rosedale Center during the day and at the Blaine Home at night; he observed the white Ford Explorer in the driveway of the Blaine Home on multiple occasions between April 26 and May 4, 2021; electronic vehicle tracking showed the white Ford Explorer travelled each day between the Blaine Home and Rosedale Center since April 30, 2021; on numerous occasions, VCET investigators observed Washington to be the primary driver of the white Ford Explorer and did not observe anyone else operating the vehicle; and beginning April 30, 2021, Washington's phone and vehicle had almost always appeared in the same location, including during the controlled buy on or around May 3, 2021. (*Id.* at 7.)  On May 4,

2021, Judge Kyle issued the requested warrant ("May 4 Warrant").  (*Id.* at 10-13.)

## C.    *Franks* **Arguments**

In the Amended Motion to Suppress and for a *Franks* Hearing, Washington argues for a *Franks* hearing because: (1) the Warrants were primarily based upon information allegedly elicited from a CI who was not known to law enforcement prior to March 2021, therefore law enforcement did not have experience with the CI and the veracity of the information he or she provided; (2) it is "conceivable" that law enforcement was feeding the CI information as prior to the CI's involvement with law enforcement, there were numerous inquiries of Washington made by officers with the National Crime Information Center ("NCIC"); (3) prior to the alleged arrest of the "CI for a DUI" (who the Court understands is the Identified Individual in the May 4 Warrant (*see* Dkt. 83 at 15-16)), Officer Cook of the Roseville Police Department had already made contact with Washington, knew where Washington worked, what vehicle he drove, and had stopped him for window tint; (4) "the alleged control [sic] buy that was noted" in the application for the May 4 Warrant occurred when Washington was in or returning from Florida, as indicated by Lyft (referred to as "lyft") logs; and (5) the photo identification that was allegedly performed with the CI was impermissibly suggestive as the officer showed the CI one picture, which was that of Washington, but the CI's description could have been "any black male."  (Dkt. 65 at 1-3.)  Washington contends that "[i]f the Court removes all of the above information provided by the CI, including the impermissible identification, the four corners of the search warrants do not contain sufficient probable cause to be signed by a judge for the evidence sought," and "[t]herefore, all evidence obtained from

those warrants must be suppressed." (*Id.* at 4.)  Washington further argues that his resulting arrest and seizure of the controlled substances were unlawful as the arrest was based upon the illegal warrants, and therefore, "all evidence and statements must be suppressed." (*Id.*)

In its opposition filed October 27, 2021, the Government counters that Washington's request for a *Franks* hearing should be denied and that the Court should resolve the issues by conducting a four-corner review of the contested warrants because Washington failed to meet "his burden to proffer affidavits, declarations, or other competent evidence establishing that the affiant acted recklessly or with deliberate indifference for the truth." (Dkt. 73 at 3.)  According to the Government, the Defendant's allegations are "alternatively vague, unverified, erroneous or irrelevant and, consequently, are clearly insufficient to warrant a *Franks* hearing." (*Id.* at 13-17.)

A hearing was held on November 29, 2021, in part, to determine whether Washington had made the requisite showing that a false statement, knowingly and intentionally or with reckless disregard for the truth, was included in the supporting affidavits for the Warrants to necessitate a hearing under *Franks*. (Dkt. 83 at 9.)  At the hearing, Judge Menendez stated that if the required showing was sufficiently made, the *Franks* hearing would then be scheduled to proceed at a later date and time to provide notice to any and all witnesses. (*Id.*)

At the hearing, Washington's attorney argued that a *Franks* hearing should be granted for three reasons: (1) there was a misrepresentation or omission as to how and when the investigation into Washington began because NCIC inquiries into Washington,

as shown in Defendant's Exhibit 13 (Dkt. 88-13), began on March 15, 2021, but the

Identified Individual described in the application for the May 4 Warrant did not provide

his or her information about Washington until their arrest on March 28, 2021, making it

"conceivable" that the Government was feeding the CI who identified "Ghost"

information to identify "Ghost" as Washington and that all of the information about the

CI and controlled buys was untrue (Dkt. 83 at 11-18); (2) law enforcement officials did

not work with the Identified Individual and CI (who the Government referred to as

"tipsters") in the past, making them unreliable (*id.* at 18-19); and (3) the Defendant was

returning back from a trip to Florida on April 26, 2021, which is the same day that

Controlled Buy #1 occurred as described in the application for the May 4 Warrant, and

the affidavit does not provide the time at which the controlled buy occurred (*id.* at 19).  In

his post-hearing briefing, Washington addresses his first and third arguments.  (*See* Dkt.

87 at 3-6.)  The Court focuses on the three arguments Washington made at the hearing

and in his post-hearing briefing, and addresses the pre-hearing arguments only to the

extent necessary to resolve the *Franks* issues.

**D.    *Franks* Legal Standard**

Pursuant to *Franks*, a defendant may seek a hearing to challenge a search warrant

on the ground that the supporting affidavit contains factual misrepresentations or

omissions relevant to the probable cause determination.  *See United States v. Daigle*, 947

F.3d 1076, 1084 (8th Cir. 2020).  "However, in order to merit a *Franks* hearing, a

defendant must show both (1) that the affiant knowingly and intentionally made false

statements or made them in reckless disregard for the truth and (2) if the false

information is excised (or the omitted information is included), the affidavit no longer establishes probable cause." *Id.* (cleaned up).  This "requirement is not met lightly and requires a defendant to offer specific allegations along with supporting affidavits or similarly reliable statements." *United States v. Gonzalez*, 781 F.3d 422, 430 (8th Cir. 2015) (citation omitted); *see also Franks*, 438 U.S. at 171 ("Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained."); *United States v. Mathison*, 157 F.3d 541, 548 (8th Cir. 1998) ("A mere allegation standing alone, without an offer of proof in the form of a sworn affidavit of a witness or some other reliable corroboration, is insufficient to make the difficult preliminary showing [under *Franks* ].").  Moreover, "[a] *Franks* hearing must be denied unless the defendant makes a **strong** initial showing of deliberate falsehood or reckless disregard of the truth." *United States v. Freeman*, 625 F.3d 1049, 1052 (8th Cir. 2010) (internal quotations and citation omitted) (emphasis added).

　　　As stated previously, the Court may not grant a *Franks* hearing if the search warrant is supported by probable cause even with the offending portions excised. *See Daigle*, 947 F.3d at 1084.  Ordinarily, searches pursuant to a warrant are reviewed to determine if there was probable cause for the search in the search warrant application and affidavit. *See Illinois v. Gates*, 462 U.S. 213, 236 (1983).  "Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place." *United States v. Fladten*, 230 F.3d 1083, 1085 (8th Cir. 2000) (citing *Gates*, 462 U.S. at 238).  The task of a court issuing a search warrant is "simply to make a practical,

common-sense decision whether, given all the circumstances set forth in the affidavit . . .
including the 'veracity' and 'basis of knowledge' of persons supplying hearsay
information, there is a fair probability that contraband or evidence of a crime will be
found in a particular place." *Gates*, 462 U.S. at 238.

"Probable cause is a fluid concept that focuses on 'the factual and practical
considerations of everyday life on which reasonable and prudent men, not legal
technicians, act.'" *United States v. Colbert*, 605 F.3d 573, 576 (8th Cir. 2010) (quoting
*Gates*, 462 U.S. at 231). In reviewing the decision of the issuing court, the duty of the
reviewing court is simply to ensure that the court had a substantial basis for concluding
that probable cause existed. *See Gates*, 462 U.S. at 238-39 (citation omitted); *see also
United States v. LaMorie*, 100 F.3d 547, 552 (8th Cir. 1996) (citation omitted) ("Our duty
as a reviewing court is to ensure that the issuing judge had a 'substantial basis' for
concluding that probable cause existed, and we owe substantial deference to the
determination of probable cause by the issuing judge."). As to what this Court should
consider when reviewing a search warrant for probable cause, "[w]hen the [issuing judge]
relied solely upon the affidavit to issue the warrant, 'only that information which is found
within the four corners of the affidavit may be considered in determining the existence of
probable cause.'" *United States v. Solomon*, 432 F.3d 824, 827 (8th Cir. 2005) (citing
*United States v. Etheridge*, 165 F.3d 655, 656 (8th Cir. 1999), quoting *United States v.
Gladney*, 48 F.3d 309, 312 (8th Cir. 1995)).

**E.**     *Franks* **Hearing Analysis**

    **1.**     **Misrepresentation or Omission as to How and When Law Enforcement Began Investigating Washington**

Washington argues that the Government engaged in a "'cloak and dagger' routine" because it excluded the information that it was investigating Washington before March 28, 2021 from the application for the May 4 Warrant.  (*See* Dkt. 87 at 3-4, 6; *see* Dkt. 83 at 12 (specifying March 28 argument about the Identified Individual related to the May 4 Warrant).)  Washington alleges that "[c]learly the warrant application misrepresents what occurred which leads a reasonable person to believe that the information that was allegedly brought to law enforcement by the informant was actually information supplied by law enforcement to the informant as they were targeting Mr. Washington prior to March 28, 2021."  (Dkt. 87 at 4.)

    This argument is unpersuasive.  First, it is not even clear that the application for the May 4 Warrant contains any misrepresentation as to the date the investigation into "Ghost" began.  The application does not state the investigation began on March 28, 2021, nor does it state the first time law enforcement learned the name "Ghost" was on March 28, 2021.  It states: "In March 2021, the Ramsey County VCET Unit opened a narcotics investigation into a suspected Drug Dealer that went by the nickname, 'Ghost.'" (Gov't Ex. 2, Dkt. 88-2 at 3.)  Washington equates this to a statement that the Identified Individual who was the subject of the DWI arrest on March 28, 2021 was "the person who first mentioned 'Ghost.'"  (Dkt. 87 at 3-4; *see also* Def.'s Ex. 14, Dkt. 88-14 (report describing DWI arrest of Identified Individual on March 28, 2021).)  The Court is not

persuaded that this is a natural reading of a statement that a narcotics investigation into a person known as "Ghost" began on an unspecified date in March 2021.

Second, and more importantly, Washington has not shown how a misrepresentation as to when the investigation began—or an omission of the fact that investigators were running NCIC searches on Washington as of March 15, 2021—is material to the probable cause analysis. Washington cites no authority for the proposition that probable cause requires a statement of the exact date an investigation began, and the Court's review of the May 4 Warrant and supporting documents reveals no reason why probable cause would be vitiated if the affidavit had identified March 15, 2021 (or some other date before March 28, 2021) as the date the investigation began.[8] Because the May 4 Warrant would still be supported by probable cause even if the allegedly omitted information were included, a *Franks* hearing on this ground is not appropriate. *See Daigle*, 947 F.3d at 1084.

Instead of explaining how including the March 15, 2021 (or earlier) beginning date for the investigation would eliminate probable cause, Washington argues that the mere fact that this information was omitted makes it "conceivable" that law enforcement officials supplied information to the CI. (Dkt. 83 at 14-15; *see also* Dkt. 87 at 3-4.)

---

[8]    The application for the April 26 Warrant states that law enforcement was already aware of Washington before their April 2021 contact with the CI, including that he worked at a shoe store inside of Rosedale Mall and drove a white GMC Yukon and was currently being investigated by law enforcement for the sale and possession of heroin. (Gov't Ex. 1, Dkt. 88-1 at 4.) Washington did not seek a *Franks* hearing as to the April 26 Warrant for failing to affirmatively state that law enforcement's investigation of Washington began on any particular date.

Washington has not offered any evidence in the form of an affidavit or otherwise reliable statement that supports this conclusion that law enforcement supplied information to the CI, which is sufficient grounds to reject this argument.  *See Franks*, 438 U.S. 3 at 171 ("Affidavits or sworn or otherwise reliable statements of witnesses should be furnished, or their absence satisfactorily explained."); *see also Gonzalez*, 781 F.3d at 430 (citation omitted) (the *Franks* "requirement is not met lightly and requires a defendant to offer specific allegations along with supporting affidavits or similarly reliable statements."). Similarly, when asked at the November 29 hearing what Washington could "point . . . to support [his] burden of showing intentionality" or reckless disregard for the truth, his attorney responded that "I'm not going to get into the case, but the facts itself and the totality of the circumstances of what is missing in this affidavit or in the affidavits to me was and to an objective person was done on purpose."  (Dkt. 83.)  This type of speculation about Investigator Garland's intent, when Washington has not identified any reason why including a March 15 (or earlier) date for the beginning of the investigation would alter probable cause, and when he has offered no evidence of any kind of misconduct or intent by Investigator Galand, falls short of the standard required under *Franks*.  As the Eighth Circuit has made clear, "[a] mere allegation standing alone, without an offer of proof in the form of a sworn affidavit of a witness or some other reliable corroboration, is insufficient to make the difficult preliminary showing [under *Franks*]."  *United States v. Mathison*, 157 F.3d 541, 548 (8th Cir. 1998).  The Court finds that the statement in the application for the May 4 Warrant that the investigation into "Ghost" was "opened" in "March 2021" does not provide a basis for a *Franks* hearing.

Further, even if the CI's statements and identification of Washington as "Ghost" were excised from the application for the May 4 Warrant, the Court would still find that that probable cause still supports the May 4 Warrant. When Investigator Garland applied for the May 4 Warrant, he attested that he and other Ramsey County VCET investigators conducted three controlled buys from Washington, searched the CI for contraband prior to each controlled buy with none found, followed the CI to the locations at which the controlled buy was to occur, conducted surveillance on Washington prior to at least two of the controlled buys, and observed Washington meet with the CI during the time when the controlled buys were to occur. (Gov't Ex. 2, Dkt. 88-2 at 4-7.) Immediately after the controlled buys, VCET investigators followed the CI as the CI drove away from the locations of the controlled buys, debriefed the CI, and obtained a "baggie" from the CI after each of the controlled buys, which contained a "powdery substance" each time that tested positive for cocaine the first time, "make-up" the second time, and cocaine and fentanyl the third time. (*Id.*) Investigator Garland further stated that he had observed the white Ford Explorer used during the controlled buys at Rosedale Center during the day and at the Blaine Residence at night on multiple occasions between April 26, 2021 and May 4, 2021, that VCET investigators had only observed Washington driving the white Ford Explorer and had observed Washington engaging in what appeared to be narcotics transactions with persons other than the CI, and that he had determined that Washington had rented the white Ford Explorer from April 26, 2021 to May 2, 2021. (*Id.*) Given the totality of the circumstances, the Court finds there was sufficient probable cause to support the Warrants even if the CI's statements and identification of Washington as

"Ghost" were excised. *See Fladten*, 230 F.3d at 1085 (citing *Gates*, 462 U.S. at 238) ("Probable cause exists when, given the totality of the circumstances, a reasonable person could believe there is a fair probability that contraband or evidence of a crime would be found in a particular place."); *see also United States v. Smith*, 266 F.3d 902, 905 (8th Cir. 2001) ("The affidavit, which reported the police surveillance of the controlled transactions, was sufficient to provide probable cause even though the confidential informant was not previously known to the police") (citations omitted).

In his pre-hearing brief, Washington also argues that the Warrants should be suppressed because the photo identification that was performed with the CI was impermissibly suggestive as the officer showed the CI only one picture, which was that of Washington, and suggests this is a basis for a *Franks* hearing. (Dkt. 65 at 2-3.) As explained below, the Court rejects this argument.

Both warrants provide in the supporting affidavits that the CI was shown a photo of Washington, without any identifying names or physical characteristics, and the CI stated the male in the photo was indeed "Ghost." (Gov't Ex. 1, Dkt. 81-1 at 4 ¶ 7; Gov't Ex. 2, Dkt. 81-2 at 3.) Washington cites no case where these circumstances would require a *Franks* hearing, nor does he identify any misrepresentation or omission from the applications for the April 26 and May 4 Warrants relating to the identification. Rather, both affidavits state that the CI was shown "a photo of Washington," and do not suggest the photo was presented with any other photos. (*See* Gov't Ex. 1, Dkt. 88-1 at 4; Gov't Ex. 2, Dkt. 88-2 at 3-7.)

It appears that Washington is arguing for "suppression" of the CI's identification from the affidavits or for a *Franks* hearing, notwithstanding the failure to identify any misrepresentation or omission, on the ground that showing a single photo was impermissibly suggestive. Even assuming this is a valid legal theory, the due process clause requires suppression of evidence of eyewitness identification only if a pretrial "photographic identification procedure was so impermissibly suggestive as to give rise to a very substantial likelihood of irreparable misidentification." *Simmons v. United States*, 390 U.S. 377, 384 (1968). The Eight Circuit has recognized "that use of single-photograph displays can be impermissibly suggestive." *United States v. Smith*, 21 F.4th 510, 518 (8th Cir. 2021) (citation omitted). Exceptions to such a finding include a prompt on-the-scene confrontation without special elements of unfairness and in situations where there is not "a very substantial likelihood of irreparable misidentification." *Id.* (citation omitted). As to the latter exception, "the opportunity of the witness to view the criminal at the time of the crime, the witness' degree of attention, the accuracy of [his/her] prior description of the criminal, the level of certainty demonstrated at the confrontation, and the time between the crime and the confrontation" are all relevant factors. *Id.* (cleaned up).

As to the April 26 Warrant, Investigator Garland attested that the CI stated that "she / he has purchased heroin from Washington on many occasions, with the most recent being days prior to our interview." (Gov't Ex. 1, Dkt. 81-1 at 3 ¶ 5.) Further, according to Investigator Garland, the CI "stated Washington was a black male in his 30's." (*Id.*) As for the May 4 Warrant, the CI was also shown Washington's photo again immediately

after the controlled buys. (Gov't Ex. 2, Dkt. 81-2 at 4-7.) The CI consistently identified

Washington as "Ghost" based on the unmarked photos. (*Id.*; Gov't Ex. 1, Dkt. 82-1 at 4

¶ 7.) Under these circumstances, and given the CI's previous familiarity with

Washington, the Court concludes that this was not a situation where there was a very

substantial likelihood of irreparable misidentification. *See Smith*, 21 F.4th at 518; *see

also United States v. Veloz*, 109 F. Supp. 3d 305, 312 (D. Mass. 2015) ("It is uniformly

held by state and federal courts, that where a witness is shown to have had prior

familiarity with a defendant, a due process hearing need not be held, as no amount of

police suggestion is likely to have influenced the witness's identification") (collecting

cases). Accordingly, the Court does not recommend suppression or a *Franks* hearing

based on the circumstances surrounding the CI's identification of Washington.

　　In his pre-hearing brief, Washington also seems to be arguing for a *Franks* hearing

because Officer Cook of the Roseville Police Department, "prior to the alleged arrest of

the CI for a DUI, had already made contact with the Defendant, knew where he worked,

what vehicle he drove and had stopped him for window tint." (Dkt. 65 at 1 (citing Def.'s

Ex. 14, Dkt. 88-14 (Officer Sean Mooney's Report of Events Occurring Between March

28-30, 2021, Dated April 27, 2021).) To the extent Washington argues that law

enforcement used Officer Cook's contact with Washington to provide information to the

Identified Individual or the CI, this is the type of speculation that does not provide

grounds for a *Franks* hearing or suppression. Further, the description of Officer Cook's

information does not suggest that Officer Cook had made contact with Washington

before the Identified Individual's arrest on March 28, 2021. Officer Cook noted the

white GMC Yukon's dark tint on March 28, 2021, and conducted the traffic stop of Washington on March 30, 2021.  (Def.'s Ex. 14, Dkt. 88-14 at 2-3.)  As a result, the Court does not recommend suppression or a *Franks* hearing on the basis of Officer Cook's contact with Washington.

### 2.    The CI's Reliability

It is unclear from Washington's post-hearing brief if he still seeks a *Franks* hearing on the grounds that (1) as argued at the November 29 hearing, because law enforcement officials did not work with the Identified Individual and CI (who the Government referred to as "tipsters") in the past, it makes them unreliable (Dkt. 83 at 18-19), and (2) as argued in his Amended Motion to Suppress and for *Franks* Hearing, the Warrants were primarily based upon information allegedly elicited from a CI who was not known to law enforcement prior to March 2021, therefore law enforcement did not have experience with the CI and the veracity of the information he or she provided (Dkt. 61 at 1).  The Court understands Washington to be arguing Investigator Garland somehow misrepresented the reliability of the CI and Identified Individual in the applications for the April 26 and May 4 Warrants and that if Investigator Garland had affirmatively stated that he had no experience with those persons, those Warrants would not have issued.

The Court rejects any such argument because the applications for the April 26 and May 4 Warrants did not make any representation as to the length of time that law enforcement had known the CI.  It is not essential that an affiant aver that an informant was previously reliable.  *See United States v. Harris*, 403 U.S. 573, 581-82 (1971) ("To

be sure there is no averment in the present affidavit, as there was in *Jones*, that the informant had previously given 'correct information,' but this Court in *Jones* never suggested that an averment of previous reliability was necessary. Indeed, [ ] the inquiry is, as it always must be in determining probable cause, whether the informant's present information is truthful or reliable."). Even if it was an omission for Investigator Garland to not affirmatively state that this was the first time he had worked with the CI or interacted with the Identified Individual, the Court finds the April 26 and May 4 Warrants would still be supported by probable cause if Investigator Garland had said he'd never worked with the CI or Identified Individual before.

"Information may be sufficiently reliable to support a probable cause finding if the person providing the information has a track record of supplying reliable information, or if it is corroborated by independent evidence." *United States v. Morales*, 238 F.3d 952, 953 (8th Cir. 2001) (quoting *United States v. Williams*, 10 F.3d 590, 593 (8th Cir.1993)). In determining whether the informant's tip has been corroborated, even innocent activity can provide sufficient support. *See United States v. Tyler*, 238 F.3d 1036, 1039 (8th Cir. 2001) (citation omitted). Moreover, not every detail must be corroborated. *See Gladney*, 48 F.3d at 313 ("When an informant's information is at least partly corroborated . . . attacks upon credibility and reliability are not crucial to the finding of probable cause.") (marks and citation omitted). "The reliability of an informant can be established through independent corroboration. Information can be corroborated through an officer's own investigation and by tips received on a police hotline and others about drug related activities. . . ." *United States v. Abari*, No. 19-cr-

103(01) MJD/ECW, 2020 WL 4727436, at *12 (D. Minn. Aug. 14, 2020) (citation omitted).

Here, Investigator Garland stated in the application for the April 26 Warrant that he had "corroborated / vetted the CI's information and believe[d] it to be very accurate and reliable."  (Gov't Ex. 1, Dkt. 81-1 at 4 ¶ 7.)  Further, the CI's information as described in the April 26 Warrant application was corroborated by the electronic messages between the CI and the 612-212-92[XX] number telling Washington the CI was at the drug deal location, which the CI showed to Investigator Garland, and the fact that Investigator Garland was "aware of Washington" before his interactions with the CI, including that Washington was being investigated for the sale and possession of heroin, that he worked at a shoe store in Rosedale Mall (consistent with the CI's statement), and that he drove a white GMC Yukon.  (*Id.* at 3-4.)

As for the May 4 Warrant, the VCET investigators observed the controlled buys and other suspected narcotics transactions involving Washington.  (Gov't Ex. 2, Dkt. 88-2 at 3-7.)  Such observations corroborate the information provided by the CI and Identified Individual.  *See Gladney*, 48 F.3d at 315; *U.S. v. Adkins*, No. 15-cr-05 (DWF/LIB), 2015 WL 3463377, *2 (D. Minn. June 1, 2015).  Further, the CI and the Identified Individual identified Washington as a supplier of controlled substances, and informed officers and investigators that they had purchased controlled substances from Washington on "many occasions."  (Gov't Ex. 1, Dkt. 88-1 at 3 ¶ 5; Gov't Ex. 2, Dkt. 88-2 at 3.)  This means that the CI's reliability was corroborated in part by the Identified Individual and vice versa.  *See United States v. Fulgham*, 143 F.3d 399, 401 (8th Cir.

1998) ("In fact, the two informants' tips were reciprocally corroborative, rendering their information enough to support a finding of probable cause.") (citation omitted); *see also United States v. Barnes*, No. 0:18-cr-120-ADM-KMM-1, 2019 WL 3293467, at *5 (D. Minn. Apr. 8, 2019), *R. & R. adopted*, 2019 WL 2353659 (D. Minn. June 4, 2019) (same) (citation omitted).  In sum, even if the affidavits for the April 26 and May 4 Warrants had affirmatively disclosed a lack of prior experience with the CI and Identified Individual, the Court concludes that their information was sufficiently corroborated such that the Warrants would still be supported by probable cause.  No *Franks* hearing is necessary as to the reliability of the CI and Identified Individual.

### 3.    Timing of Washington's Trip to Florida and Controlled Buy #1

Washington further argues that a *Franks* hearing is necessary and probable cause is lacking because he returned to Minnesota from Florida on April 26, 2021, which is the same day that one of the controlled buys allegedly occurred, and the affidavit in support of the May 4 Warrant does not provide the time during which the controlled buy allegedly occurred.  (Dkt 65 at 2; Dkt 87 at 6.)  In support of his argument, Washington submitted a copy of his flight itinerary from Miami, Florida to Minnesota, as well as Lyft receipts for transportation rides he took on April 26, 2021.  (Def.'s Exs. 16-20, Dkts. 88-16 to 88-20.)  While Washington's supporting exhibits show he was in Miami until about 6:10 a.m. on April 26, 2021, they also show that he arrived at the Minneapolis St. Paul, Minnesota airport ("MSP Airport") around 9:10 a.m. on the same day.  (*See* Def.'s Ex. 16, Dkt. 88-16 at 4.)  The exhibits show that upon arriving at MSP Airport, Washington took a Lyft ride from the airport around 9:49 a.m. on April 26, 2021 and was dropped off

at the Blaine Home around 10:22 a.m.  (Def.'s Ex. 18, Dkt. 88-18 at 1-2.)  Washington

then left the Blaine Home around 10:43 a.m. and arrived at Rosedale Center around 11:03

a.m., and then left Rosedale Center around 1:10 p.m. and arrived at XXX 4th Ave. S.,

Minneapolis, Minnesota around 1:24 p.m.  (Def.'s Ex. 19, Dkt. 88-19 at 1-2; Def.'s Ex.

20, Dkt. 88-20 at 1-2.)

Washington contends that Investigator Garland's affidavit for the May 4 Warrant

does not provide a specific time when the first controlled buy allegedly occurred.  The

affidavit states that it occurred "[w]ithin 72 hours of April 26th, 2021."  (Gov't Ex. 2, Dkt.

81-2 at 4.)  At the hearing, the Government stated that the timeframe of "within 72 hours

of April 26" was used in part to "protect the identity of the person making that buy, to not

give a specific date and time to narrow down and disclose that individual by disclosing

that information" and further stated that the first controlled buy took place on April 26.

(Dkt. 83 at 29-30.)  Because the exhibits provided by Washington show that he was at

Rosedale Center (where the first controlled buy occurred) for about 2 hours on April 26,

2021,[9] and given the Government's representation that the timeframe was used to

"protect the identity of the person making that buy," the Court finds there was no

misrepresentation or omission that would require a *Franks* hearing.  (*See* Gov't Ex. 2,

Dkt. 88-2 at 4; Def.'s Ex. 19, Dkt. 88-19 at 1-2; Def.'s Ex. 20, Dkt. 88-20 at 1-2.)  The

Court further finds that the lack of specificity as to the date of the first controlled buy

---

[9]    Washington's Lyft receipts, which he offered as exhibits (Def.'s Exs. 17-20, Dkts. 88-17 to 88-20), are sufficient basis to find no misrepresentation or omission in the affidavit supporting the May 6 Warrant so as to warrant a *Franks* hearing.

does not vitiate probable cause such that a *Franks* hearing is required.  *See Rivera v. United States*, 928 F.2d 592, 604-05 (2d Cir. 1991) (finding no issue with an affidavit's failure to give specific dates and noting that "[s]o long as law enforcement agents present adequate information to permit the magistrate to conclude that there is probable cause and do not suppress facts that would cast doubt on its existence, they may properly exclude information that would unduly risk revealing a confidential informant's identity and exposing him or her to harm"); *see also United States v. Johnson*, Cr. No. 18-2665 JAP, 2019 WL 4980929, *4 (D.N.M. Oct. 8, 2019).  Under these circumstances, the Court finds that Washington has not met his burden under *Franks*

For all of these reasons, the Court recommends that Washington's request for a *Franks* hearing be denied.[10]

## F.    Motion to Suppress

### 1.    Legal Standard

A search warrant is valid under the Fourth Amendment when supported by probable cause.  *United States v. Gabrio*, 295 F.3d 880, 882 (8th Cir. 2002).  Probable cause "exists when a 'practical, common-sense' inquiry that considers the totality of the circumstances set forth in the information before the issuing judge yields a 'fair

---

[10]    The majority of courts within this District have treated a motion for a *Franks* hearing as a non-dispositive motion.  *See, e.g.*, *United States v. Hari*, No. CR181501DWFHB, 2019 WL 7041849, at *1 (D. Minn. Dec. 20, 2019) ("Motions for *Franks* hearings are non-dispositive and, therefore, reviewed for clear error.") (citation omitted); *United States v. Mays*, Crim. No. 19-75, 2019 WL 4565636, at *4 (D. Minn. Sept. 20, 2019) (collecting cases).  The Court includes the request for a *Franks* hearing as part of the Report and Recommendation because it is intertwined with the Amended Motion to Suppress and for *Franks* Hearing.

probability that contraband or evidence of a crime will be found in a particular place.'"

*United States v. Stevens*, 530 F.3d 714, 718 (8th Cir. 2008) (quoting *Gates*, 462 U.S. at

238). As to what this Court should consider when reviewing a search warrant for

probable cause, "[w]hen the [issuing judge] relied solely on the affidavit presented to

him, 'only that information which is found within the four corners of the affidavit may be

considered in determining the existence of probable cause.'" *Solomon*, 432 F.3d at 827

(citing *Etheridge*, 165 F.3d at 656, quoting *Gladney*, 48 F.3d at 312). An affidavit

provides "probable cause for a warrant if it 'sets forth sufficient facts to establish that

there is a fair probability that contraband or evidence of criminal activity will be found in

the particular place to be searched.'" *United States v. Mutschelknaus*, 592 F.3d 826, 828

(8th Cir. 2010) (quoting *United States v. Snyder*, 511 F.3d 813, 817 (8th Cir. 2008)).

"[A] warrant is proper so long as the evidence as a whole creates a reasonable probability

that the search will lead to the discovery of evidence." *United States v. Humphrey*, 140

F.3d 762, 764 (8th Cir. 1998).

### 2.     Analysis

Washington argues that information included in the affidavits for the Warrants

was stale because the alleged "initial contact with the so-called informant was middle

[M]arch and the first search warrants were not obtained until late April, some 45 days

later." (Dkt. 65 at 4.)

"While a lapse of time between the observations of a witness and the issuance of a

search warrant may render probable cause fatally stale, there is no bright-line test for

determining when information is stale." *United States v. Gettel*, 474 F.3d 1081, 1086

(8th Cir. 2007) (cleaned up).  "A warrant becomes stale if the information supporting the warrant is not sufficiently close in time to the issuance of the warrant and the subsequent search conducted so that probable cause can be said to exist as of the time of the search." *United States v. Ortiz-Cervantes*, 868 F.3d 695, 700 (8th Cir. 2017) (cleaned up).  "The date of the occurrence of the facts relied upon in an affidavit is of importance in the determination of probable cause because untimely information may be deemed stale." *United States v. Summage*, 481 F.3d 1075, 1078 (8th Cir. 2007).  "The passage of time is not necessarily the controlling factor in determining staleness, as other factors, such as the nature of the criminal activity involved and the kind of property subject to the search, must be considered."  *Gettel*, 474 F.3d at 1086 (cleaned up).

The first warrant issued in this case was obtained on April 26, 2021.  (Gov't Ex. 1, Dkt. 81-1 at 7-10.)  In the application for that warrant, Investigator Garland stated that the CI informed him that he/she had purchased heroin from Washington "just days prior to [their] interview," that the CI contacted Washington through the 612-212-92[XX] phone number, that Investigator Garland knew Washington "was currently being investigated by Law Enforcement for the sale and possession of heroin," and that Investigator Garland had been conducting "an ongoing Felony investigation" regarding Washington and others.  (Gov't Ex. 1, Dkt. 81-1 at 3 ¶ 5, 4 ¶ 7, 5 ¶ 13.)  As to the May 6 Warrant, it contained information relating to three controlled buys involving Washington, the first on April 26, 2021 and the third "[w]ithin the past 72 hours" before the application for that warrant, along with information about the location of Washington's phone, the white Ford Explorer, and Washington's movements between the Blaine Residence and

Rosedale Center during the same time frame.  (Gov't Ex. 2, Dkt. 88-2 at 4-7.)  "[I]n investigations of ongoing narcotics operations, intervals of weeks or months between the last described act and the application for a warrant did not necessarily make the information stale."  *United States v. Formaro*, 152 F.3d 768, 771 (8th Cir. 1998) (cleaned up).  Given the totality of the circumstances, the Court finds that the information contained in the application for the April 26 and May 6 Warrants was not stale.

### 3.    *Leon* Exception

Because the Warrants were supported by probable cause (as set forth above), the Court need not determine whether the good-faith exception set forth in *United States v. Leon*, 468 U.S. 897 (1984), should apply.  The Court finds, however, that even if the Warrants were lacking in probable cause, the officers' reliance on the Warrants would have been reasonable under *Leon*.

Under *Leon*, "'evidence seized pursuant to a search warrant issued by a [judge] that is later determined to be invalid[] will not be suppressed if the executing officer's reliance upon the warrant was objectively reasonable.'"  *United States v. Houston*, 665 F.3d 991, 994 (8th Cir. 2012) (quoting *Proell*, 485 F.3d at 430).  In *Leon*, the Supreme Court stated that "'searches pursuant to a warrant will rarely require any deep inquiry into reasonableness,' for 'a warrant issued by a magistrate normally suffices to establish' that a law enforcement officer has 'acted in good faith in conducting the search.'"  468 U.S. at 922 (citations omitted).  The *Leon* exception also applies to situations where information in a supporting affidavit is stale.  *See United States v. Gettel*, 474 F.3d 1081, 1086 (8th

Cir. 2007) ("Moreover, even assuming that the information in the affidavit was stale, the 'good faith' exception of [*Leon*] would apply.").

However, there are certain instances when "the purpose of the exclusionary rule—deterring police misconduct—will not be served by suppressing illegally seized evidence." *United States v. Martin*, 833 F.2d 752, 755 (8th Cir. 1987); *Leon*, 468 U.S. at 922-23. "When a police officer acts in an objectively reasonable manner in reliance on a subsequently invalidated search warrant, there is no rational reason for suppressing the fruits of the search." *Martin*, 833 F.2d at 755. The Court's "good-faith inquiry is confined to the objectively ascertainable question whether a reasonably well trained officer would have known that the search was illegal despite the magistrate's authorization." *Leon*, 468 U.S. at 923 n.23. The reviewing court should consider the totality of the circumstances, "including any information known to the officer but not included in the affidavit . . . ." *United States v. Jackson*, 784 F.3d 1227, 1231 (8th Cir. 2015) (citation omitted).

In this regard, evidence obtained as a result of an unconstitutional search should be suppressed under the following circumstances:

    i.    when the affidavit or testimony supporting the warrant contained a false statement made knowingly and intentionally or with reckless disregard for its truth, thus misleading the issuing judge;

    ii.    when the issuing judge "wholly abandoned his judicial role" in issuing the warrant;

    iii.    when the affidavit in support of the warrant is "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable"; and

iv.    when the warrant is "so facially deficient" that no police officer could
       reasonably presume the warrant to be valid.

*Houston*, 665 F.3d at 995 (quoting *Proell*, 485 F.3d at 431). "In determining the presence

of good-faith reliance on a judge-issued search warrant, the court must consider [the]

totality of circumstances, including information not presented to the judge issuing the

warrant but known to the police officers." *United v. Clay*, 646 F.3d 1124, 1127 (8th Cir.

2011)). With respect to the third exception, the Eighth Circuit has explained: "'Entirely

unreasonable' is not a phrase often used by the Supreme Court, and we find nothing in

*Leon* or in the Court's subsequent opinions that would justify our dilution of the Court's

particularly strong choice of words." *Proell*, 485 F.3d at 432 (quoting *Carpenter,* 341

F.3d at 670).

Here, as discussed above, the Court does not find that the affidavits were

intentionally or recklessly misleading, or that the issuing judges wholly abandoned their

judicial role in issuing the search warrants. As to the remaining exceptions, the Court has

already concluded that the affidavits provided an adequate factual basis for the issuing

judges to have found probable cause. Therefore, based on all the facts and circumstances

of this case, it was not "entirely unreasonable" for law enforcement officers to rely on the

Warrants.

*   *   *

In sum, the Court recommends denial of the Amended Motion to Suppress and for

*Franks* hearing as to the April 26 and May 4 Warrants, and consequently as to the other

Warrants. The Court also recommends denial of the Motion to the extent it seeks

suppression of the evidence and statements obtained as a result of Washington's arrest, as that request was predicated on the success of Washington's arguments for a *Franks* hearing and for suppression of all evidence obtained as a result of the Warrants.[11]

### III.   AMENDED MOTION FOR DISCLOSURE OF CONFIDENTIAL INFORMANT (DKT. 64)

Pursuant to Rule 12(b) of the Federal Rules of Criminal Procedure, *Roviaro v. United States*, 353 U.S. 53 (1957), *Brady v. Maryland*, 373 U.S. 83 (1963), and *Kyles v. Whitley*, 514 U.S. 419 (1995), Defendant moves for an order directing the Government to disclose the following:

1.   The name, address, and date of birth of the confidential informant(s) (CI) who is alleged to have made controlled buys from Demarcus Washington;

2.   Any cooperation agreement or the like entered into between the above confidential informant(s) or any other informants in this matter and any law enforcement agency;

3.   A detailed description of any arguable benefit which any of the above informant(s) may have ever received from the United States Attorney's Office, the Drug Enforcement Administration or any other law enforcement agency which is in any way associated with the prosecution of this case;

4.   A complete listing of any and all law enforcement agencies with whom any confidential informant(s) in this matter has had any contact at any time during the last 10 years;

---

[11]    The Court notes that the warrants at Government Exhibits 2, 7, 8 and 12 pertain, at least partly, to McMillian.  However, Washington does not have standing to challenge the Warrants as it pertains to McMillian.  *See United States v. Russell*, 847 F.3d 616, 618 (8th Cir. 2017) ("Fourth Amendment rights are personal rights that may not be asserted vicariously.") (quoting *United States v. Barragan*, 379 F.3d 524, 529 (8th Cir. 2004)).  Accordingly, the Motion is denied to the extent it seeks suppression of evidence obtained as to McMillan.

5.    True and correct copies of all files maintained by any individual within any identified law enforcement agency regarding each identified confidential informant;

6.    Any information possessed by the state or any law enforcement agency that may be regarded as possible impeachment of said confidential informant(s) including any police report naming said informant(s) under their true name or any alias;

7.    Any award memo, DEA-103, DEA-356, or any other document relating to any monetary payments or other consideration extended to any identified confidential informant(s) by any law enforcement agency;

8.    A listing of the names and addresses of any correctional facility in which any identified informant(s) was ever incarcerated, the dates of incarceration, and the informant's inmate number for each respective period of incarceration; and

9.    A listing by case name, file number, and court of all cases in which such informant(s) has ever given testimony.

(Dkt. 64 at 1-2.)  Defendant argues that disclosure is necessary because the informant(s) are material witnesses as he or she "is alleged to have engaged directly with [Defendant] through communications for controlled purchase(s) of heroin and fentanyl" and because Defendant and his fiancée were in Florida during the alleged controlled buy that occurred within 72 hours of April 26, 2021, "making disclosure all the more necessary as clearly the credibility of the CI is in question."  (*Id.* at 3-4.)  At the November 29 hearing, Washington clarified that he was seeking disclosure of the identity of "the identified individual, as well as the CI that is brought forth as the second individual involved in this case."  (Dkt. 83 at 25.)

A.    **Legal Standard**

The Government has a general, although not absolute, "privilege to withhold the disclosure of the identity of a confidential informant." *Carpenter v. Lock*, 257 F.3d 775, 779 (8th Cir. 2001) (citing *Roviaro v. United States*, 353 U.S. 53 (1957)). When deciding whether to disclose information about an informant, the court must balance "the public interest in protecting the flow of information against the individual's right to prepare his defense." *Roviaro*, 353 U.S. at 62. "Where the disclosure of an informer's identity, or of the contents of his communication, is relevant and helpful to the defense of an accused, or is essential to a fair determination of a cause, the privilege must give way." *Id.* at 60-61. The essential consideration when deciding whether evidence is relevant and helpful to the defense is "whether or not the evidence is material to the accused's defense or a fair determination of the cause." *United States v. Barnes*, 486 F.2d 776, 778 (8th Cir. 1973); *Carpenter*, 257 F.3d at 779 ("[T]he threshold issue is whether the informant is a material witness.") (citation omitted).

"Where the witness is an active participant or witness to the offense charged, disclosure will almost always be material to the accused's defense." *Devose v. Norris*, 53 F.3d 201, 206 (8th Cir. 1995) (citation and footnote omitted); *see also United States v. Foster*, 815 F.2d 1200, 1203 (8th Cir. 1987) (citation omitted) ("The disclosure of an informant who was an active participant in the crime the accused is charged with is generally required."). This is in contrast to "cases involving 'tipsters' who merely convey information to the government but neither witness nor participate in the offense, disclosure is generally not material to the outcome of the case and is therefore not

required." *United States v. Harrington*, 951 F.2d 876, 878 (8th Cir. 1991) (citing *United States v. Bourbon*, 819 F.2d 856, 860 (8th Cir. 1987)); *see also United States v. Lapsley*, 334 F.3d 762, 764 (8th Cir. 2003) ("Consequently, disclosure is typically not required when the informant merely conveys information to the government but neither witnesses nor participates in the offense.") (quotation marks and citations omitted).

The Government's disclosure obligation with respect to confidential informants is generally satisfied when it provides a defendant with information pertaining to an informant's identity and location so that the defendant may contact the informant and request an interview or subpoena his or her testimony at trial. *See United States v. Padilla*, 869 F.2d 372, 376-77 (8th Cir. 1989). If the Government has particular concerns about protecting these individual(s) or is aware that the defendants may encounter difficulty in locating the informant, then it should produce the informant(s) to defendants to interview in lieu of providing his or her address to the defendants. *Id.* That said, whether the Government provides the name and address of the informant(s) to the defendants or produces them for interview, the informant(s) always have the right to decline to be interviewed and the Government has no obligation to "encourage" the informant to speak to the defendants. *See United States v. Bittner*, 728 F.2d 1038, 1041-42 (8th Cir. 1984) (finding no impermissible conduct by a Government agent when he advised a witness of her right to decline interviews with defendant's attorney).

**B.    Analysis**

As stated above, Washington seeks disclosure of the CI and Identified Individual because they provided information used to obtain the Warrants. (Dkt. 83 at 25; Dkt. 64 at

3-4.)  Washington argues in the alternative that the Court should conduct an in camera review to decide "what information may be exculpatory or may lead to further information or may lead to the *Franks* hearing in this case."  (Dkt. 83 at 25; Dkt. 87 at 4.)

At the November 29, 2021 hearing the Government clarified that there is one CI in this case, as well as one Identified Individual.  (Dkt. 83 at 27.)  According to the Government, disclosure is not required because the CI and Identified Individual are "mere tipsters"[12] and because Washington is "only charged with the results of the search warrants," not the controlled buys, "and neither individual is going to be called as a witness to testify on behalf of the government."  (*Id.* at 27, 28; *see also* Dkt. 72 at 2-3.)

Washington is charged with Possession with Intent to Distribute Fentanyl and Heroin (Count I) and Possession with Intent to Distribute Fentanyl (Count II) based on events occurring on May 5, 2021.  (Dkt. 1.)  Those charges are based on the seizures that occurred from the Blaine Residence and Washington's person on May 5, 2021 (*see id.*), not the controlled buys between April 25, 2021 and May 4, 2021 or any conduct in which the CI or Identified Individual participated.  Accordingly, disclosure of neither the CI's nor Identified Individual's identity is required given that they did not "witness, participate in, or provide evidence of [Washington's] charged crimes."  *United States v Bradley*, 924 F.3d 476 at 479, 481-82 (8th Cir. 2019) (finding that disclosure of confidential reliable informant's identity who was involved in a controlled buy that led to officers obtaining a search warrant was not required where the defendant was not charged

---

[12]    The Government later agreed at the hearing that the CI was not a "mere tipster." (Dkt. 83 at 28.)

with the controlled buy and noting that the "confidential informant's participation in an uncharged controlled buy does not change this conclusion"); *see also Harrington*, 951 F.2d 876 at 878 (finding that the identity of a confidential informant was not subject to disclosure where the informant participated in a controlled buy but "neither witnessed nor participated in the search" that led to the possession charges and "could not offer any evidence bearing on the possession charges.").

Washington also asked the Court to conduct an *in camera* review of the two informants to determine what information may be exculpatory information, may lead to further information, or may lead to a *Franks* hearing. (Dkt. 83 at 25.) The Court is not aware of any authority that requires (or permits) an *in camera* review based on such speculation, and declines to conduct such a review. For these reasons, the Court recommends denial of the Amended Motion for Disclosure of Confidential Informant.[13]

## IV.    ORDER

Based on the files, records, and proceedings herein, **IT IS ORDERED THAT** Defendant Demarcus Lee Washington's Giglio Motion (Dkt. 59) is **GRANTED** insofar as the Government shall comply with its requirement to disclose materials covered by *Brady v. Maryland*, 373 U.S. 83 (1963), *Giglio v. United States*, 405 U.S. 150 (1972), and their progeny, and further insofar as within ten (10) days of the date of this Order, the Government must disclose all *Brady*/*Giglio* information in its possession or of which it has become aware as of the date of this Order, if not previously disclosed, and must

---

[13]    The Court recommends rather than orders denial due to the relationship between this Motion and the Amended Motion to Suppress and for *Franks* hearing.

promptly supplement its disclosure upon receipt of any additional *Brady*/*Giglio*

information not previously disclosed.

## V.    **RECOMMENDATION**

Based on the files, records, and proceedings herein, **IT IS RECOMMENDED**

**THAT:**

1.    Defendant Demarcus Lee Washington's Amended Motion to Suppress

Evidence from All Search Warrants, which also seeks a *Franks* hearing (Dkt. 65), be

**DENIED**.

2.    Defendant Demarcus Lee Washington's Amended Motion for Disclosure of

Confidential Informant (Dkt. 64) be **DENIED**.


DATED: February 23, 2022                    *s/Elizabeth Cowan Wright*
                                            ELIZABETH COWAN WRIGHT
                                            United States Magistrate Judge


## NOTICE

This Report and Recommendation is not an order or judgment of the District Court and is therefore not appealable directly to the Eighth Circuit Court of Appeals.

Under District of Minnesota Local Rule 72.2(b)(1), "a party may file and serve specific written objections to a magistrate judge's proposed finding and recommendations within 14 days after being served a copy" of the Report and Recommendation. A party may respond to those objections within 14 days after being served a copy of the objections. D. Minn. LR 72.2(b)(2). All objections and responses must comply with the word or line limits set for in D. Minn. LR 72.2(c).